Rudy ROA, Petitioner,

v.

Leonard A. PORTUONDO, Superintendent, Shawangunk Correctional Facility, Respondent.

No. 02 Civ. 6116(PKC)(FM).

United States District Court, S.D. New York.

April 22, 2008.

Rudy Roa, Wallkill, NY, pro se.

Kenneth Alan Paul, Frank J.Loscalzo, Attorney at Law #300, Huntington, NY, for Rudy Roa.

Morrie I. Kleinbart, New York, NY, for Leonard A. Portuondo.

### MEMORANDUM AND ORDER ADOPTING REPORT AND RECOMMENDATION

P. KEVIN CASTEL, District Judge.

In January 1995, petitioner Rudy Roa was convicted of two counts of Second Degree Murder, one count of Second Degree Attempted Murder and two counts of First Degree Robbery after trial by jury in New York Supreme Court, New York County. In the aggregate, Roa was sentenced to thirty-three and one-third years to life in prison. Prior to sentencing Roa, the Honorable Frederic Berman, then a Justice of the Supreme Court, New York County, observed that "in [his] twenty two years as a Judge [he had] not had a case which [he] felt was more cruel and vicious."

Roa filed a petition for a writ of habeas corpus on July 31, 2002. (Doc. # 1.) The

prior history of this proceeding is set forth in the September 10, 2007 Report and Recommendation (the "R & R") of Magistrate Judge Frank Maas. (Doc. # 47.) This matter was reassigned to this Court on October 16, 2006. (Doc. # 36.) Roa filed an amended habeas petition (the "Amended Petition") on December 14, 2006. (Doc. # 42.)

In the forty-eight page R & R, Magistrate Judge Maas, recommended that Rudy Roa's Amended Petition be denied. Roa requested an extension to file objections to the R & R by letter dated October 22, 2007. I ordered that the final deadline to file objections be extended to November 30, 2007. (*Id.*) Roa's objections were not received by the Court until December 4, 2007. (Doc. # 48.) The objections filed by Roa are undated and nothing in the record indicates when they were delivered to prison officials for mailing. However, because Roa is an incarcerated *pro se* petitioner, his objections were received less than one week after the deadline and no objection regarding timeliness has been made, I will consider the petitioner's objections.

Through the lens of petitioner's objections, I have conducted a *de novo* review of the record. 28 U.S.C. § 636(b); Rule 72, Fed.R.Civ.P. For the reasons that follow, I adopt the R & R in its entirety and dismiss the Amended Petition.

## I. *Procedurally Defaulted Claims*

Judge Maas correctly observed that several claims in the Amended Petition related to Roa's post-arrest statement and to an alleged ineffective assistance of counsel may not be considered by this Court because Roa procedurally defaulted on those claims in state court. Procedural defaults in state court divest federal courts of jurisdiction to hear the defaulted claims unless the petitioner demonstrates "cause for the default and actual prejudice as a result of

the alleged violation of federal law, or ... that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred ....."). Showing cause for default requires a petitioner to put forth "some objective factor external to the defense" which caused the claim not to have been previously raised. *Gonzalez v. Sullivan*, 934 F.2d 419, 422 (2d Cir.1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). Objective impediments to compliance with the procedural rules which would excuse a petitioner's noncompliance for habeas purposes include: 1) the factual or legal basis of a claim was not reasonably available to petitioner's counsel; 2) interference by officials made compliance impracticable; and 3) ineffective assistance of counsel. *Murray*, 477 U.S. at 488, 106 S.Ct. 2678.

To demonstrate "actual prejudice" under the standard for excusing a procedural default, a habeas petitioner must show the constitutional errors raised in the petition actually and substantially disadvantaged petitioner's defense so that he was denied "fundamental fairness." *Id.* at 494, 106 S.Ct. 2678. To show that the district court's failure to hear the claims will result in a fundamental miscarriage of justice, a petitioner must show that he is "actually innocent." *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir.2001) (citing *Coleman*, 501 U.S. at 748–50, 111 S.Ct. 2546). With respect to the ineffective assistance of counsel impediment, the Second Circuit has held that defense counsel's "ineptitude [must] rise[ ] to the level of a violation of a defendant's Sixth Amendment right to counsel" to es-

tablish cause for procedural default in the context of a habeas petition. *Id.* at 91 (citations omitted). As outlined below, petitioner cannot meet the standards required to have the defaults excused on any of the procedurally defaulted claims.

### a. Post–Arrest Statement Claims

The Amended Petition asserts that Roa's post-arrest statement was introduced into evidence at trial in violation of his Sixth Amendment right to counsel. Roa raised this claim, prior to perfecting his direct appeal, in the first of three section 440.10 motions he filed in an attempt to have his conviction vacated. (Amended Petition, Ex. E at 1.) The trial court rejected Roa's claim because section 440.10(2)(b) requires the denial of a motion to vacate a judgment when, at the time of the motion, the subject judgment is either still appealable or the appeal is pending. N.Y.Crim. Proc L. § 440.10(2)(b). Roa's subsequent direct appeal failed to assert that claim, thus, it was not exhausted at the state level. It is now, however, incapable of being exhausted because New York law permits criminal defendants only one direct appeal and one application for leave to appeal to the Court of Appeals. *Spence v. Sup't, Great Meadow Corr. Facility,* 219 F.3d 162, 170 (2d Cir.2000). Moreover, Roa cannot obtain collateral review of this claim in state court because once a defendant has prosecuted his direct appeal, he may not obtain review of an issue that could have been included in that appeal. *Id.; Coleman,* 501 U.S. at 735 n. 1, 111 S.Ct. 2546 (if no procedural avenue remains to exhaust a claim in state court, the claim is procedurally defaulted for federal habeas purposes). Thus, Judge Maas correctly concluded that because the Sixth Amendment post-arrest statement claim was not included in Roa's direct appeal, it is in procedural default and this Court is

divested of its jurisdiction to consider its merits.

The claim that Roa was not adequately informed of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before being questioned in police custody suffers from the same procedural malady. That claim was first made in an omnibus pretrial motion which the trial court denied. Roa subsequently failed to include it in his direct appeal or in any of his post-conviction motions. Because Roa procedurally defaulted on that claim by not including it in his direct as-of-right appeal or in any of his section 440.10 motions, this Court lacks jurisdiction to hear it. *See Coleman,* at 750, 111 S.Ct. 2546.

The admissibility of Roa's post-arrest statement is also challenged on due process and equal protection grounds in the Amended Petition, but, like the *Miranda* claim, those claims were not raised in either his direct appeal or in any of his post-conviction motions and cannot be exhausted now because of the one-appeal limit imposed by New York law. *Spence,* 219 F.3d at 170. They are therefore procedurally defaulted and not properly before this Court.

As observed by Judge Maas, Roa's defaults cannot be excused by establishing cause, actual prejudice or a fundamental miscarriage of justice with respect to the claims relating to his post-arrest statement. He has shown no objective impediments to compliance stemming from either a lack of information available to his attorney or from official interference; nor has he demonstrated that any constitutional errors denied him fundamental fairness.

Roa has also failed to show that he is actually innocent under any standard. Roa admitted he entered the apartment where the robbery, murder and attempted murder took place with the intent to con-

duct a robbery with a gun. (Hearing Tr. at 31–36.) This admission is corroborated by Roa's fingerprints which were found on a light fixture which concealed a hidden void used as a drug cache. (*Id.*) At his trial, the only question before the jury was whether Roa or his accomplice fired the shots. An eyewitness testified that it was Roa who ordered her to "get down" on the floor before stealing her jewelry, murdering her boyfriend and then shooting her in the back of the head. (Tr. 93–96, 113–114, 190.) In the face of this evidence against him, Roa replies that "Petitioner has always asserted that he is innocent, but does not have the proof (other that [sic] his own testimony) to prove it." (Pet. Objections at 2). Petitioner has not made an adequate showing that he is actually innocent of the crimes for which he was convicted for purposes of being excused from his procedural defaults.

In addition, Roa has not demonstrated that the defaults relating to his post-arrest statement claims may be excused because they were caused by ineffective assistance of counsel. Although he asserts his trial counsel failed "to properly preserve and argue" his right to counsel while making his post-arrest statement, he ignores the fact that his trial counsel raised that issue during a pretrial suppression hearing. (Hearing Tr. 105–115, 177–78.)

Moreover, Roa's procedural defaults cannot be excused by his appellate counsel's failure to raise his post-arrest statement claims on appeal because putting forward the strongest issues on appeal at the expense of leaving others out does not constitute ineffective assistance of counsel. To establish ineffective assistance of appellate counsel through failure to include claims in an appeal, a petitioner must establish that counsel failed to raise "significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994); *Jones v. Barnes*, 463 U.S. 745, 751–54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983) (for habeas purposes, defense counsel assigned to prosecute appeal does not have constitutional duty to raise every nonfrivolous issue). There is a "strong presumption that [counsel's] conduct falls within the wide range of reasonable professional assistance" thus requiring a petitioner to "overcome the presumption that, under the circumstances, the challenged action might be considered sound ... strategy." *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citation and internal quotation marks omitted).

While it is true that appellate counsel failed to assert the *Miranda*, Fifth and Fourteenth Amendment claims related to Roa's post-arrest statement on appeal, nothing in the record indicates that the issues argued on appeal were "clearly and significantly weaker" than the post-arrest statement claims made in the Amended Petition. *Mayo*, 13 F.3d at 533. Indeed the trial court concluded that the *Miranda* claim, raised during a pretrial suppression hearing, was meritless because of its factual finding that Roa was fully advised of his *Miranda* rights before knowingly and voluntarily waiving them and that the police were not aware Roa had retained counsel in this case at the time he made his post-arrest statement. (Appendix, Exh. B at 15.) In habeas proceedings, state court findings of fact are presumed to be correct and petitioners have the burden of rebutting the state court's findings by clear an convincing evidence. *See Leslie v. Artuz*, 230 F.3d 25, 31 (2d Cir.2000). On this record, Roa has not and cannot meet this burden.

b. Ineffective Assistance of Counsel Claims

Separate from the issue of whether ineffective assistance of counsel can excuse

Roa's procedurally defaulted claims is the issue of whether certain of the ineffective assistance of counsel claims raised in the Amended Petition are themselves procedurally defaulted. Roa claims his trial lawyer's failure to object to bolstering of testimony by the prosecutor and to the court's jury instruction regarding eyewitness testimony deprived him of his constitutional right to counsel. Like the claims related to his post-arrest statement, these claims, initially made in his second section 440.10 motion, submitted after his direct appeal was perfected, are procedurally defaulted. In denying the 440.10 motion, the state court held that the claims should have been raised on direct appeal as they were based entirely on facts contained within the record on appeal. (Ex. J. at 4–5.) Because the trial court ruled these claims procedurally barred, they cannot be heard by this Court. *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546.

In Roa's third 440.10 motion, he claimed, as he does in his Amended Petition, that his trial counsel provided ineffective assistance because he failed to contact Roa's prior counsel and would not allow Roa to testify on his own behalf. Although the state court rejected these claims as unmeritorious, it also deemed them procedurally barred because Roa was not justified in failing to raise them in his prior section 440.10 motions. N.Y. C.P.L. § 440.10(3)(c) (state court "may deny a motion to vacate a judgment when ... [u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so.") The claims are procedurally defaulted for habeas purposes because a state court's reliance on a procedural bar prohibits a petitioner from seeking habeas review even though the state court ruled on the merits in the alternative. *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996) (procedural

default is an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits.). However, even if these claims were not procedurally defaulted, they nonetheless would fail on the merits.

Roa contends that had his prior attorney been contacted by his trial counsel, she could have testified at the pretrial suppression hearing that she represented Roa, not only on a past, unrelated case, but also on the present case. This testimony would have resulted in the suppression of his post-arrest statement, Roa asserts, and failing to call her violated his constitutional right to counsel. Judge Maas concluded correctly, however, that, in light of a sworn affirmation submitted by Roa's prior attorney in which she stated that "at the times of any statements allegedly made to law enforcement officials" she represented Roa "in connection with outstanding felony bail jumping charges in New York County Supreme Court," she could not have later testified with any measure of credibility that Roa had also retained her to represent him in this case prior to his arrest. (May 5, 1993 Affirm. Of Susan M. Russell, Esq., ¶ 13.) In view of the prior affidavit, Roa's trial counsel cannot be faulted for failing to call Roa's prior attorney to testify in a suppression hearing.

With respect to the merits of Roa's contention that his constitutional rights were violated by his trial attorney's failure to call him as a witness, he claims that he wanted to testify on his own behalf but was "coerced" by his attorney into waiving that right. In rejecting this claim in Roa's third 440.10 motion, the trial court stated:

The defendant stated that he understood his options and that he did not need to discuss them further with [trial counsel]. Now, all of the sudden, ... the defendant claims that, contrary to what he

informed the judge while speaking on the record, he really did not understand his rights. This claim is contradicted by the record.

(Appendix, Exh. L.) As Judge Maas correctly concluded, this claim is without merit. The record reveals that Roa was fully informed by the trial court of his "absolute right to testify" and given an opportunity to further consider his decision not to. (Trial Tr. at 520–21.) Roa passed on that opportunity and voluntarily declined the option to testify in open court. (*Id.*)

## II. *Unexhausted Claims*

Unlike a procedurally defaulted claim, the Antiterrorism and Effective Death Penalty Act ("AEDPA") allows federal courts to exam the merits of unexhausted claims and deny a writ of habeas corpus based on that examination. 28 U.S.C. 2254(b)(2). Here, Judge Maas determined it prudent to examine the merits of Roa's unexhausted claims because of the lengthy period of time this case has been pending in federal court. After doing so, he recommended that all of the ineffective assistance of trial counsel and appellate counsel claims be dismissed as meritless. Judge Maas recommended the same with respect to Roa's claim that the Appellate Division violated his Fifth and Fourteenth Amendment due process and equal protection rights by failing to address facts or hold hearings in connection with its decision denying petitioner relief. Having determined Judge Mass's recommendations to be correct, I comment briefly on those claims.

### a. Ineffective Assistance of Trial Counsel

### i. Pre–Indictment Delay

Roa contends that trial counsel should have but failed to request a *Singer* hearing to challenge the prosecution's delay in arresting and indicting him after he was identified by the police. *See People v. Singer*, 44 N.Y.2d 241, 405 N.Y.S.2d 17, 376 N.E.2d 179 (1978) (unjustifiable lengthy delay in commencing prosecution may require dismissal even without a showing of actual prejudice). The prosecution intentionally delayed arresting and indicting him, Roa claims, so that the police could get his statement without his counsel being present. Judge Maas correctly concluded · that this unexhausted claim is meritless because, *inter alia*, the record reveals the delay of approximately nine months was justified and not part of a strategy to deny Roa his constitutional rights. Extensive efforts were made to apprehend Roa from the time he was identified until he was apprehended. The detective in charge of the case conducted surveillance of Roa's neighborhood, circulated flyers containing Roa's photograph and created "wanted cards" to give to fellow officers. (Suppression Hearing Tr. at 16–18, 86–88.) While it is true that during the nine months between his identification and his arrest Roa had voluntarily surrendered in connection with another alleged crime and had made court appearances in connection therewith, the detective in charge of this case testified that he was unaware of those circumstances and that had he been aware, Roa "would have been apprehended a lot sooner." (*Id.* at 88.) Roa's unexhausted pre-indictment delay claim is without merit.

### ii. Cross Examination of Detective Imperato / Pretrial Investigation

Roa claims that he received ineffective assistance of counsel because trial counsel did not ask the detective in charge of investigating the crime for which Roa was convicted whether he knew that Roa was not "on the run" from police and that he had, in fact, turned himself in connection

with an unrelated case. However, the prosecution never argued that Roa was "on the run" or otherwise seeking to avoid apprehension, and, as Judge Maas observed, no competent criminal defense attorney would needlessly seek to inform a jury of his client's involvement in other crimes. Thus, petitioner's proposed area of inquiry would have been counterproductive. Trial counsel's failure to pursue this line of questioning with the detective does not constitute ineffective assistance of counsel.

Roa also asserts that his trial counsel was constitutionally ineffective because he conducted an inadequate pretrial investigation which failed to apprise him that the lineup in which Roa was identified by the victim-eyewitness was tainted. Roa contends that he told his trial counsel that the detective in charge of investigating the crimes for which he was convicted took a photograph of him prior to the lineup and likely showed it to the victim-eyewitness, enabling her to quickly pick him as the perpetrator. Specifically, Roa claims:

> Counsel was informed by the defendant at the hearings that "detective Imperato took a[P]olaroid photograph of me, by myself, in the absence of counsel, before the line-up" and "that I was the only one wearing a burgundy sweatshirt that stood out", the defendant also informed counsel that "if the witness was shot in the head as they claim and has problems with her vision", the detective could have shown her that photo, which was probably the reason the witness identified me as the perpetrator so quickly.

(Appendix, Exh. H at 6–7.) Judge Maas's R & R, however, correctly concludes that this claim is meritless because, *inter alia,* the victim-eyewitness knew Roa before the crime occurred and had identified him in a photo array only a few days after the crime was committed, months before the lineup of which petitioner complains. (Hearing Tr. at 52; Trial Tr. at 114–15.) Trial counsel's refusal to pursue a purely speculative line of inquiry at Roa's behest did not constitute ineffective assistance of counsel.

Citing prison visitation logs as evidence that the time trial counsel spent conferring with him was inadequate, Roa contends he received ineffective assistance of counsel because of trial counsel's failure to adequately prepare for trial. Roa also points to trial counsel's entreaties that he accept a plea as support for the assertion that trial counsel did not adequately prepare. The state court rejected this claim, made in Roa's second 440.10 motion, as "insufficient to substantiate the claim of deprivation of effective counsel." (Appendix, Exh. J at 3) Judge Maas reached the same conclusion. Indeed, Roa has failed to make a showing that any additional time spent with him or otherwise preparing for trial would have changed the result of the trial—and that is what *Strickland* requires. 466 U.S. at 691, 104 S.Ct. 2052 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.").

### iii. Bolstering

Separate from Roa's procedurally defaulted claim of ineffective assistance of counsel based on trial counsel's failure to object to prosecutorial bolstering is the claim that the alleged bolstering independently violated his Fourteenth Amendment due process and equal protection rights. The independent bolstering claim, however, appears to be a mislabeled improper vouching claim. In general, a prosecutor may not "vouch for their witnesses' truthfulness" or "express ... personal belief[s] or opinion[s] as to the truth or falsity of

any testimony or evidence or the guilt of the defendant." *U.S. v. Modica*, 663 F.2d 1173, 1178–79 (2d Cir.1981) (citation and internal quotation marks omitted). Notwithstanding the rule against prosecutorial vouching, improper remarks by prosecutors "justify a reversal . . . only if it caused the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *U.S. v. Carr*, 424 F.3d 213, 227 (2d Cir.2005) (citation and internal quotation marks omitted); *Modica* at 1182 (defendant was not substantially prejudiced or deprived of a fair trial despite numerous improper remarks by prosecutor).

Petitioner complains of two statements made by the prosecutor during trial about the eyewitness identification of Roa, one during the government's opening statement and one made during its closing argument. In her opening statement, the prosecutor described to the jury how the victim-eyewitness had previously identified Roa as the man who shot her and killed her boyfriend and said "I expect she'll still remember what he looked like and she'll be able to identify him in court." (Trial Tr. 21–22.) During her closing, the prosecutor said several times, "I submit to you" followed by various iterations of statements describing the eyewitness's identification of Roa as truthful and correct. (Trial Tr. at 574, 578–79, 583–84, 594.) Judge Maas concluded that the prosecutor's remarks during her opening statement were permissible as an overview of what the government believed and expected the evidence would show and were not improper vouching for the eyewitness or an improper expression of the prosecutor's personal beliefs. Regarding the remarks made during the prosecutor's closing argument, Judge Maas concluded they were not improper as they referenced the evidence that was presented and expressed no personal opinions. *See United States v. Perez*, 144 F.3d 204, 210 (2d Cir.1998) (prosecutor's arguments not improper simply because they begin with, "I submit"). Judge Maas is correct on both accounts. Roa's constitutional rights were not violated by the prosecutor's statements.

### b. Ineffective Assistance of Appellate Counsel

Roa's appellate counsel was constitutionally ineffective, the Amended Petition asserts, because he failed to include an argument in the appellate brief that trial counsel was constitutionally ineffective for failing to object to the trial court's eyewitness testimony jury charge. Although appellate counsel did brief the argument that the court's jury charge was inadequate, he did not assert that trial counsel was ineffective for failing to object to that charge. After the Appellate Division declined to review the claim, Roa asserted ineffective assistance of trial counsel in a 440.10 motion based on trial counsel's failure to object. Roa made this claim notwithstanding the Appellate Division's statement that had the claim been preserved, it would have found that the trial court "delivered a full and complete identification charge." *People v. Roa*, 270 A.D.2d 103, 103, 704 N.Y.S.2d 470 (1st Dep't 2000). The claim challenging trial counsel's decision not to object to the jury charge was deemed procedurally barred by the state court because it should have been included in Roa's direct appeal. Roa, now asserts, however, that the jury instruction violated his Fifth and Fourteenth Amendment due process rights in addition to his Sixth Amendment right to effective appellate counsel.

In the due process context, a habeas petitioner is not entitled to relief unless "there is a reasonable likelihood that the jury applied the challenged instruction in a

way that violates the Constitution." *Jones v. United States,* 527 U.S. 373, 390, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (internal quotation marks and citation omitted). Whether the jury instruction violated the petitioner's Fifth and Fourteenth Amendment rights turns on "whether the ailing instruction by itself so infected the entire trial that the resutling conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (internal quotation marks and citations omitted). As already noted, it cannot be seriously disputed that Roa was in the apartment on the day of the shootings intending to commit a robbery with a gun. Thus, Judge Mass concluded correctly that, in that context, the jury charge regarding eyewitness identification was sufficient to enable the jury to decide the narrow issue of whether Roa or his cohort fired the shots.

With respect to the ineffective assistance of appellate counsel claim, it is foreclosed by the rigorous standard enunciated in *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052 and *Jones,* 527 U.S. at 390, 119 S.Ct. 2090. In addition, and as Judge Maas correctly concluded, the instruction given conformed to the recommended practice in New York courts and incorporated the expanded pattern jury instructions lauded by the Second Department in *People v. Daniels,* 88 A.D.2d 392, 401, 453 N.Y.S.2d 699 (2d Dep't 1982). It thus cannot be said that the instruction violated due process.

### c. Alleged Constitutional Violation by the Appellate Division

Finally, Roa's claim that the Appellate Division denied him his Fifth and Fourteenth Amendment due process and equal protection rights fails. The specific claim is that the Appellate Division violated Roa's constitutional rights by failing to address the facts as presented by Roa, failing to cite any case law in its decision rejecting Roa's appeal and petition for a writ of *coram nobis,* and failing to order a hearing prior to issuing a summary order. Judge Maas correctly concluded that the record was sufficient for the Appellate Division to determine the merits of Roa's claims without a hearing and that it is well within the Appellate Division's right to reject claims summarily.

### III. *Conclusion*

The Amended Petition is DENIED. The Clerk is directed to enter judgment in favor of respondent.

Petitioner having not made a substantial showing of the denial of a constitutional right on any ground, a certificate of appealability will not issue. 28 U.S.C. § 2253; *Lozada v. United States,* 107 F.3d 1011, 1016–17 (2d Cir.1997), *abrogated on other grounds by United States v. Perez,* 129 F.3d 255, 259–60 (2d Cir.1997). The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith. *See Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

### *REPORT AND RECOMMENDATION TO THE HONORABLE P. KEVIN CASTEL*

FRANK MAAS, United States Magistrate Judge.

### I. *Introduction*

In 1992, petitioner Rudy Roa ("Roa") and Steven Rodriguez ("Rodriguez") entered an apartment in Upper Manhattan hoping to obtain money and drugs through the use of force. In the course of the ensuing robbery, they fatally shot the occupant of the apartment and wounded his

girlfriend. Following a trial in Supreme Court, New York County, the jury convicted Roa on two counts of Murder in the Second Degree, one count of Attempted Murder in the Second Degree, and two counts of Robbery in the First Degree. Thereafter, on March 22, 1995, Justice Frederic Berman, before whom the case was tried, sentenced Roa to prison terms which, in the aggregate, amounted to a sentence of thirty-three and one-third years to life.

Roa now brings this habeas corpus proceeding, pursuant to 28 U.S.C. § 2254 ("Section 2254"), to challenge his conviction on numerous grounds. His original *pro se* petition was filed on July 1, 2002. After extensive litigation relating to the timeliness of that petition and the exhaustion of his claims, Roa filed an amended petition on August 7, 2006. (Docket No. 42 ("Petition" or "Pet.")). For the reasons that follow, that Petition should be denied. Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Roa should be denied a certificate of appealability because he has failed to make a substantial showing of the denial of a constitutional right.

## II. *Background*

### A. *Factual History*

On the evening of January 7, 1992, Juan Munoz ("Munoz") and his girlfriend, Evelyn Rivera ("Rivera"), were in his apartment at 618 Academy Street in Upper Manhattan. (Tr. 73–74).[1] At approximately 10 p.m., Rivera responded to a knock on the front door. Looking through the peephole, she saw Roa and a second man she did not recognize. (*Id.* at 74–76, 148). Rivera recognized Roa because she had seen him with Munoz on prior occa-

sions. (*Id.* at 114–15). Although Rivera asked Munoz not to open the door, he permitted the two men to enter the apartment. (*Id.* at 76, 145, 166). Knowing that Munoz sometimes sold drugs out of his apartment and wishing not to be involved, Rivera went to a nearby store. (*Id.* at 76, 141–42). By the time she returned to the apartment five minutes later, Roa and the other man were no longer there. (*Id.* at 76–77).

Approximately one hour later, Roa returned to Munoz's apartment in the company of a different man, later identified as Rodriguez. (*Id.* at 77–78, 148–49, 157–58). After gaining entry into the apartment, Roa and Rodriguez followed Munoz into the kitchen, while Rivera remained on the couch. (*Id.* at 79–80). Several moments later, Rivera heard the sounds of a struggle. (*Id.* at 80). Roa then entered the living room and directed Rivera at gunpoint to "get on the floor." (*Id.* at 82–83). In response to Roa's questions, Rivera said that she had no knowledge of any money or drugs in the apartment, but added that she would not provide the information even if she did. (*Id.* at 85, 186). Roa then left Rivera with Rodriguez and brought Munoz into the bathroom, where he demanded that Munoz turn over his money and drugs. (*Id.* at 84–85). Although Munoz initially protested that he had neither money nor drugs in the apartment, he later agreed to give Roa what he wanted. (*Id.* at 84–87).

Subsequently, Roa brought Rivera into the bedroom, to which Rodriguez also had taken Munoz. (*Id.* at 89–90). After telling Rivera that he would not injure her, Roa directed them both to lie on the bed-

1. "Tr." refers to the transcript of the jury trial. (Docket Nos. 40–41). "H." refers to the transcript of the suppression hearing. (Docket No. 40). "S." refers to the transcript of Roa's sentencing. (Docket No. 41). "Ex." refers to the exhibits in the Appendix to the Respondent's Answer. (Docket No. 39).

room floor. (*Id.* at 89, 92). Rivera complied, but Munoz refused to do so, protesting that Roa had gotten what he wanted and should leave. (*Id.* at 90–92).

By this point, Rivera and Munoz had already had their hands tied behind their backs. (*Id.* at 92). From her position on the floor, Rivera could see that Roa had his gun pointed at Munoz. (*Id.* at 93–95). Although Rivera could not see Rodriguez, she heard him tell Roa to "just kill them and get it over with." (*Id.* at 94). Rivera pleaded with Roa not to kill Munoz, but soon heard two gun shots and saw Munoz fall to the floor. (*Id.* at 94–96). Roa then shot Rivera in the back of her head. (*Id.* at 95–96). After Roa and Rodriguez fled from the apartment, Rivera crawled to Munoz and then into the hallway of the building, where a neighbor spotted her. (*Id.* at 96–98).

The police arrived at the building shortly thereafter. The officers found Rivera in the hallway bleeding from her head and radioed for an ambulance, which transported her to Harlem Hospital. (*Id.* at 40–41, 97–98). Munoz was in the bedroom, where he had sustained fatal gunshot wounds to his head. (*Id.* at 42, 500–06). Among the items recovered from the apartment during a subsequent investigation were a .25–caliber semi-automatic pistol, the separate slide for that weapon, and several discharged .25–caliber shells. (*Id.* at 227–231, 235–44, 283, 286). Despite the state of "disarray" in the apartment, the police also noticed a partially-open trap door, which hid a "vacant space" in the ceiling of the bedroom. (*Id.* at 42–43). Roa's fingerprints were on the light fixture concealing the trap door. (*Id.* at 273–74).

The police ballistics squad later determined that two bullets removed from Munoz's head by the New York City medical examiner had been fired from the .25–caliber pistol recovered in the apartment.

(*Id.* at 383–84, 392–98, 500–06). The medical examiner established that these shots were fired at close range. (*Id.* at 503).

## B. *Pretrial Proceedings*

### 1. *Arrest and Indictment*

Roa was arrested on October 10, 1992. (H.18). Thereafter, on October 30, 1992, he and Rodriguez were named in an indictment charging them each with two counts of Murder in the Second Degree (intentional and felony murder), one count of Attempted Murder in the Second Degree, two counts of Robbery in the First Degree, two counts of Robbery in the Second Degree, and one count of Assault in the First Degree. (*See* Resp't's Mem. at 2–3).

### 2. *Suppression Hearing*

Roa moved to suppress his post-arrest statement to the police on the grounds that he had not been advised of his *Miranda* rights, and that it was taken in violation of his right to counsel because he was represented by an attorney in connection with an unrelated case at the time it was made. (*See* Ex. A at 8). Roa also moved to suppress all of the identification evidence. (*Id.* at 7).

At a hearing on December 6, 1994, Detective Anthony Imperato ("Det.Imperato") testified that an anonymous source had advised him within days after the shootings that Roa was one of the persons responsible. (H.9). After receiving the tip, Det. Imperato assembled a photo array that included a photograph of Roa and showed it to Rivera, who was in a New Jersey hospital. (*Id.* at 10, 12–13). Rivera identified Roa from the photo array as one of the men involved in the shootings. (*Id.* at 13–15). Following the identification, Det. Imperato prepared an "investigation card" and caused department "circulars" to be distributed to other members

of the New York City Police Department to ensure that he would be contacted upon Roa's arrest. (*Id.* at 16–18).

Det. Imperato also visited Roa's apartment several times between January and October of 1992 in an effort to locate him. (*Id.* at 86–87). Det. Imperato testified that he was unaware during this period that Roa had appeared regularly in state court between April and August of 1992 in connection with the prosecution of other unrelated charges. He later learned, however, that Roa had retained Susan Russell, Esq. to represent him in that earlier case. (*Id.* at 87–88). As Det. Imperato explained, he knew that a warrant for Roa's arrest had been issued in that case, but did not know that Roa had surrendered because the New York City Police Department was not involved in his return to court. (*Id.* at 88).

Det. Imperato testified further that he learned of Roa's arrest at approximately 5 a.m. on October 10, 1992. (*Id.* at 18–19). After the arrest, the police permitted Roa to make one telephone call, which he placed to a woman named Wanda. (*Id.* at 38, 114). Det. Imperato began his interview of Roa shortly after that call. (*Id.* at 22). At the outset of the interview, Det. Imperato stated that the police were investigating Roa's possible involvement in a murder, and he then advised Roa of his *Miranda* rights. (*Id.*). Roa waived those rights in writing without asking to speak to a lawyer or mentioning Ms. Russell. (*Id.* at 22–25, 101, 105, 107–08, 110, 112).

At the conclusion of the interview, Det. Imperato reduced Roa's statement to a writing that Roa signed after he was afforded an opportunity to review it and make corrections. In his signed statement, Roa confirmed that he had gone to the apartment with the intention of committing a robbery, but contended that Rodriguez was the person who shot Munoz and Rivera. (*Id.* at 27–31).

Almost immediately after Roa signed the statement, Det. Imperato received a telephone call from Ms. Russell, who had learned from Roa's family that Roa was at the police station. Ms. Russell told Det. Imperato that Roa had an "outstanding case." He responded that "it didn't really make a difference." (*Id.* at 113).

Later the same day, the police conducted a lineup for Rivera, which consisted of Roa and five police officer "fillers," four of whom were Hispanic. Ms. Russell was present during the lineup at which Rivera identified Roa as the shooter. (*Id.* at 117–18, 124).

Det. Imperato was the only witness at the suppression hearing who gave testimony relevant to Roa's pretrial motions. Following the completion of the hearing, Justice Berman issued a written decision denying Roa's motion to suppress on December 20, 1994. (*See* Ex. B). In his decision, the Justice concluded that neither the photo array nor the lineup was unduly suggestive. (*Id.* at 14). The Justice further rejected Roa's contention that he was "not in a position to waive his *Miranda* rights" prior to being questioned simply because he was then being "represented by an attorney on a prior, unrelated pending charge." (*Id.* at 15).

### 3. *Motion to Sever*

On the date that he denied Roa's suppression motion, Justice Berman also inquired from the bench whether either defendant wished to move for a severance on the ground that each defendant was alleging that the other was the shooter. (*See id.* Attach. at 2–3).[2] After Rodriguez's

---

2. The minutes of the December 20, 1994, hearing before Justice Berman are annexed to

counsel made that motion, Justice Berman granted a severance and scheduled Roa's trial to proceed first. (*Id.* at 3–4).

## C. *Trial*

Roa's trial began on January 5, 1995. (Tr. 1). The two principal prosecution witnesses were Rivera and Det. Imperato. Rivera testified about the events of January 7, 1992, and identified Roa in court as the man who had committed the robbery and shot Munoz and her while their hands were bound. (*Id.* at 79, 136, 176–77). Det. Imperato testified about his interview of Roa and read into the record Roa's signed confession, in which he conceded that he had gone to the apartment with Rodriguez to rob Munoz at gunpoint, but contended that he was not the person who had fired the gun. (*Id.* at 413–32).

There was no defense case. (*See id.* at 523–24).

## D. *Verdict and Sentencing*

On January 22, 1995, the jury returned a verdict of guilty on each of the charges presented for its consideration: two counts of Murder in the Second Degree, one count of Attempted Murder in the Second Degree, and two counts of Robbery in the First Degree. (*Id.* at 685–86).

Roa was sentenced on March 22, 1995. Before imposing sentence, Justice Berman characterized the shooting of the two bound victims as an "assassination," commenting that "in [his] twenty two years as a Judge [he had] not had a case which [he] felt was more cruel and vicious." (S.8–9). The Justice noted further that Roa would have faced a death sentence had New York's then newly-enacted capital punishment statute been in effect at the time Roa shot Munoz. (*Id.* at 10). The Justice then sentenced Roa to terms which, in the ag-

gregate, amounted to a prison sentence of thirty-three and one-third years to life. (*Id.* at 11).

## E. *Subsequent Procedural History*

### 1. *First Motion to Vacate Judgment of Conviction*

On February 11, 1997, Roa moved *pro se*, pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL"), for an order vacating his judgment of conviction on the grounds that: (a) the trial court lacked "jurisdiction" to sentence him to consecutive prison terms; (b) the prosecutor had introduced his post-arrest statement in violation of his Sixth Amendment rights; and (c) his trial counsel provided ineffective assistance because he failed to question Det. Imperato about Roa's other pending case. According to Roa, such cross-examination of Det. Imperato would have shown that Roa "had a bench warrant" but "turned [him]self in," and that the detective therefore could have located him earlier. (*See* Pet. ¶ 12(a); Ex. E ("First 440.10 Motion")).

On March 14, 1997, Justice Berman denied this motion on the ground that each of the issues raised could be presented as part of Roa's direct appeal, which had yet to be perfected. (*See* Ex. G). Thereafter, on September 16, 1997, the Appellate Division denied Roa's application for leave to appeal that decision. *See People v. Roa*, No. M–3342, 1997 N.Y.App. Div. LEXIS 9987, at *1 (1st Dep't Sept. 16, 1997).

### 2. *Direct Appeal*

On August 6, 1999, James Nolan, Esq., who had been appointed as Roa's appellate counsel, filed a brief on Roa's behalf without his knowledge or consent. In that brief, Mr. Nolan argued that (a) the trial

Ex. B.

court had deprived Roa of due process by failing to instruct the jury properly with respect to its evaluation of eyewitness testimony, and (b) the sentence that Roa received was excessive. (*See* Ex. C). On August 30, 1999, after receiving a copy of that brief, Roa requested the assignment of new appellate counsel, or, in the alternative, leave to file his own *pro se* brief because Mr. Nolan allegedly had failed to raise important legal issues.[3] (*See* Ex. M at 8). On November 16, 1999, the Appellate Division denied that motion.[4] (*See id.*).

On March 14, 2000, the Appellate Division unanimously affirmed Roa's conviction, concluding that the jury charge claim was unpreserved and meritless, and that Justice Berman had not abused his sentencing discretion. *See People v. Roa*, 270 A.D.2d 103, 704 N.Y.S.2d 470 (1st Dep't 2000). Thereafter, Mr. Nolan sought leave to appeal to the Court of Appeals, again without Roa's knowledge or consent. (*See* Pet. ¶¶ 9, 10; Ex. M at 9 n. 2). On July 28, 2000, the Court of Appeals summarily denied that application. *See People v. Roa*, 95 N.Y.2d 857, 714 N.Y.S.2d 8, 736 N.E.2d 869 (2000). Mr. Nolan did not thereafter file a petition for a writ of certiorari on Roa's behalf. (*See* Pet. ¶ 10(g)).

3. *First Habeas Petition*

Roa's original habeas petition, dated July 1, 2002, was received by this Court's Pro Se Office on July 11, 2002. (*See* Docket No. 1).

4. *Second Motion to Vacate Judgment of Conviction*

On August 27, 2002, Roa again moved pursuant to CPL § 440.10 for an order vacating his judgment of conviction, this time arguing that his trial counsel, Harold Schwartz, Esq., had rendered ineffective assistance. (*See* Pet. ¶ 12(b); Ex. H ("Second 440.10 Motion")). On December 16, 2002, Justice Eduardo Padró denied the Second 440.10 Motion. (*See* Ex. J).

Roa's first claim in his Second 440.10 Motion was that Mr. Schwartz should have requested a *Singer* hearing rather than merely filing a CPL § 30.30 motion challenging the prosecution's pre-indictment delay. In *People v. Singer*, 44 N.Y.2d 241, 254–55, 405 N.Y.S.2d 17, 376 N.E.2d 179 (1978), the New York Court of Appeals held that the People must establish good cause for "protracted" preindictment delay, but are entitled to an evidentiary hearing in order to meet their burden. Rejecting Roa's *Singer* claim, Justice Padró noted that Roa did not allege that he had drawn Mr. Schwartz's attention to any problems arising out of the pre-arrest delay, failed to address Mr. Schwartz's reasons for not submitting a *Singer* motion, and had not shown any prejudice. (*See* Ex. J at 2–3). As the Justice explained, Roa's "barebone conclusion [was] insufficient to substantiate his [*Singer*] claim." (*Id.* at 3 (citation omitted)).

Roa's second contention was that Mr. Schwartz's failure to prepare adequately for trial was established by his entreaties to Roa to plead guilty, his failure to question Det. Imperato during the pretrial hearing about a photograph of Roa that had been taken before the lineup, and the fact that he never visited Roa at a Department of Correction facility. The Justice

---

3. The additional issues that Roa sought to present related to the taking of his statement outside the presence of his counsel and alleged "bolstering" by the prosecutor. (*See* Ex. M at 12–16).

4. This was Roa's second motion for the appointment of new appellate counsel. The Appellate Division denied his earlier application, dated May 17, 1999, on August 6, 1999. (*See id.* at 7).

rejected the merits of this claim as well because (a) Roa admitted that he had met with his counsel in the court's holding facilities, (b) the failure to inquire about the photograph was "not indicative of [a] failure to conduct [a] pre-trial investigation," and (c) counsel might reasonably have concluded that a plea was the best option for Roa given the prospect that he would be convicted following a trial. (*Id.* at 3–4).

Roa also argued in his motion that Mr. Schwartz failed to object to a portion of the prosecutor's opening statement and certain trial testimony that constituted improper "bolstering." (Ex. H at 8–9). Rather than addressing the merits of these claims, the Justice held that Roa's arguments were based entirely on the trial record and therefore should have been raised on direct appeal. Because they were not, the Justice declined to consider them on collateral review. (*See* Ex. J at 4 (citing CPL § 440.10(2)(c))).

The Justice also rejected on procedural grounds Roa's final claim that Mr. Schwartz should have objected to the trial court's identification charge. As noted above, the Appellate Division previously had rejected Roa's claim regarding the charge as unpreserved and meritless. Justice Padró declined to consider the same claim, repackaged as an ineffective assistance of counsel claim, because it was based entirely on the trial record and could have been raised on direct appeal. (*Id.* at 5).

On April 3, 2003, the Appellate Division summarily denied Roa's application for leave to appeal the denial of his Second 440.10 Motion. *People v. Roa*, No. M–358, 2003 N.Y.App. Div. LEXIS 3627, at *1 (1st Dep't Apr. 3, 2003).

### 5. *Third Motion to Vacate Judgment of Conviction*

On August 28, 2004, Roa filed a third motion pursuant to CPL § 440.10, again based on the alleged ineffective assistance of his trial counsel. This time, Roa alleged that Mr. Schwartz had not contacted his prior counsel, Ms. Russell, prior to the suppression hearing, or honored his request to testify on his own behalf. (*See* Pet. ¶ 12(c); Ex. K ("Third 440.10 Motion")).

Justice Padró denied the Third 440.10 Motion on March 21, 2005. (*See* Ex. L). As the Justice explained, Roa's failure to raise either of his new claims in his Second 440.10 Motion precluded his attempt to raise them in his Third 440.10 Motion. The Justice also found that both branches of Roa's motion were meritless because Roa (a) had "failed to demonstrate the absence of legitimate reasons for counsel's failure to procure Ms. Russell's testimony at the hearing," and (b) clearly understood that he had a right to testify at trial and knowingly waived that right on the record.[5] (*Id.* at 3–4).

On March 21, 2005, the Appellate Division summarily denied Roa's application for leave to appeal from the denial of his Third 440.10 Motion. *See People v. Roa*, No. M–1835, 2005 N.Y.App. Div. LEXIS 6862, at *1 (1st Dep't June 14, 2005).

---

5. In his decision, Justice Padró mistakenly stated that seven years had elapsed between Roa's sentencing and the filing of his "initial" CPL § 440.10 motion. It appears that Justice Padró therefore was unaware of Justice Berman's decision regarding Roa's First 440.10 Motion. (Ex. G). If anything, the filing of that motion underscores the correctness of Justice Padró's decision because Roa had filed *two* prior CPL § 440.10 motions that included claims of ineffective assistance of trial counsel, neither of which included the claims advanced in his Third 440.10 Motion. If those allegations had some colorable merit, Roa could reasonably have been expected to raise them in at least one of his prior motions.

### 6. Motion for Writ of Error Coram Nobis

On February 22, 2005, Roa filed a motion for a writ of error *coram nobis* alleging that he had been denied the effective assistance of appellate counsel because Mr. Nolan failed to argue on appeal that: (a) the police violated his right to counsel; (b) the police obtained his confession in violation of his *Miranda* rights; (c) the prosecution improperly "bolstered" its witness' testimony; and (d) Mr. Schwartz failed to (i) object to the prosecution's "bolstering," (ii) object to the court's jury charge, (iii) move to dismiss the charges because of the prosecution's preindictment delay, or (iv) conduct a sufficient pretrial investigation. (*See* Pet. ¶ 12(d); Ex. M).

The Appellate Division denied Roa's motion summarily on June 16, 2005. (*See* Pet. ¶ 12(d)). Thereafter, Roa sought leave to appeal to the Court of Appeals. On January 31, 2006, that application was denied. *See People v. Roa*, 6 N.Y.3d 780, 811 N.Y.S.2d 347, 844 N.E.2d 802 (2006).

### 7. Subsequent Proceedings in this Court

#### a. Prior Litigation

On September 11, 2002, Chief Judge Mukasey referred this case to me for a report and recommendation. (Docket No. 4). Thereafter, on November 13, 2002, the respondent moved to dismiss Roa's initial petition on the ground that it was untimely. (Docket No. 6). On March 28, 2003, I recommended that this motion be granted. (Docket No. 9 ("First Report")).

Subsequently, on May 17, 2004, Judge Mukasey rejected my recommendation and denied the respondent's motion, relying, in part, on reply papers that Roa had submitted to him, but which I was unable to locate before issuing the First Report. Judge Mukasey also remanded the case to

me, directing that I "develop the facts relevant to Roa's claim that [he was entitled to equitable tolling because he] was never notified of the appellate decisions in his case and ... could not otherwise have learned of those dispositions through reasonable diligence." (*See* Docket No. 16 ("Remand") at 11). Judge Mukasey further indicated that I "should try to locate Roa's [First 440.10 M]otion and decide which claims in Roa's habeas petition are exhausted and which claims remain unexhausted." (*Id.* at 13).

Although Judge Mukasey expressly noted that there might not be a need for a "full-blown evidentiary hearing," (*id.* at 11), I concluded that some discovery was necessary. (Docket No. 17). Accordingly, on May 25, 2004, I directed that counsel be appointed for Roa pursuant to the Criminal Justice Act. (*See id.*). Murray Singer, Esq. subsequently was appointed as Roa's counsel. (*See id.*).

An evidentiary hearing then was held before me on November 19, 2004. The testimony and other evidence adduced at the hearing established that Roa had not been notified of the progress of his direct appeal. (*See* Docket No. 26 at 10–11, 19–20, 37–40). Nevertheless, Roa regularly checked the Table of Cases in West's New York Digest in an effort to monitor the status of his appeal. (*See id.* at 45). After not hearing anything for nearly three years, Roa wrote to the Appellate Division in 2002, learning for the first time that his direct appeal had been denied. (*Id.* at 43). He filed his initial petition less than two months later. (*See* Docket No. 1).

For these reasons, I concluded in a second Report and Recommendation that Roa was "entitled to have the time for the filing of his petition equitably tolled from July 28, 2000 [the date the Court of Appeals denied Mr. Nolan's application for leave to appeal], until May 16, 2002 [the date the

Court of Appeals denied Roa's *pro se* request for the same relief]." (Docket No. 29 ("Second Report"), at 21). I also concluded, however, that most of the claims that Roa sought to pursue were unexhausted, and that the Court therefore did "not presently have the jurisdiction to hear those claims." (*Id.* at 19–21).

Regrettably, my Second Report failed to state that Roa should be given time to exhaust his unexhausted claims in accordance with the procedures set forth in *Zarvela v. Artuz,* 254 F.3d 374, 381–82 (2d Cir.2001). Focusing on my comments regarding a lack of jurisdiction, Judge Mukasey therefore dismissed Roa's habeas petition by order dated January 27, 2006. (Docket Nos. 31, 32). Evidently believing that he had the right to pursue his claims despite the dismissal, Roa submitted a new petition to the Pro Se Office on April 24, 2006, which was assigned a new docket number. *See Roa v. Smith,* 06 Civ. 3682(MBM)(FM).

The dismissal of Roa's original petition plainly was a mistake. Moreover, because I had recommended that the limitations period be equitably tolled only until May 16, 2002, Roa's new habeas proceeding would have been time barred if the dismissal of the initial petition remained in effect. For these reasons, by order dated July 13, 2006, Judge Mukasey dismissed Roa's second petition and amended his January 27 order *nunc pro tunc* to dismiss only the *unexhausted* claims in Roa's initial petition; Judge Mukasey also stayed any further proceedings regarding the remaining claims so that Roa could exhaust his unexhausted claims in state court. (Docket No. 33).

With the case thus back on track, I directed, by order dated July 17, 2006, that Roa serve and file his amended petition and any additional supporting papers by August 18, 2006. (Docket No. 34). On or about August 14, 2006, Roa filed his amended Petition. (Docket No. 42). Thereafter, on October 16, 2006, this proceeding was reassigned to Your Honor following Judge Mukasey's retirement. (Docket No. 36). After the reassignment, the respondent submitted his opposition papers on November 3, 2006. (Docket Nos. 38, 39). On January 10, 2007, Roa submitted reply papers. (Docket No. 43 ("Reply")). The matter is consequently now fully briefed.

b. *Roa's Claims*

In his Petition, Roa asserts that:

- He was denied his Sixth Amendment right to counsel, as well as his rights to due process and equal protection under the Fifth and Fourteenth Amendments, because the police questioned him outside the presence of an attorney who had been appointed to represent him in another case and whose presence he had requested.

- He was denied his Fifth Amendment right to a fair trial, as well as his rights to equal protection under the Fifth and Fourteenth Amendments, because his "illegally signed confession" was admitted into evidence at trial, thereby requiring him to be a witness against himself.

- He was denied his Sixth Amendment right to remain silent, as well as his New York State constitutional rights, when the prosecutor introduced a statement at trial that he allegedly did not make.

- He was denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments, because his trial counsel failed to ask Detective Imperato certain questions relating to an outstanding bench warrant.

He was denied his Sixth Amendment right to compulsory process, and therefore his rights to due process and equal protection under the Fifth and Fourteenth Amendments, because he wanted to call an attorney who had been appointed to represent him in another case, as well as testify in his own defense, but his trial attorney refused to call the attorney or him as witnesses.

He was denied his Sixth Amendment right to effective assistance of counsel, and therefore his rights to due process and equal protection under the Fifth and Fourteenth Amendments, because his trial counsel failed to call a witness in his favor, failed to request a hearing regarding pre-indictment delay, failed to conduct any pretrial investigation, failed to object to the trial court's jury instruction regarding eyewitness testimony, failed to object to the prosecution's "bolstering" of witness testimony, failed to raise his "right to counsel" argument, and coerced him into waiving his right to testify after preventing him from testifying.

He was denied his rights to due process, a fair trial, and equal protection under the Fourteenth Amendment because the prosecution "bolstered" witness testimony.

He was denied his Fifth Amendment right to due process by reason of excessive pre-indictment delay.

He was denied his Sixth Amendment right to effective assistance of counsel, and therefore his rights to due process and equal protection under the Fifth and Fourteenth Amendments, because his appellate counsel failed to raise "obvious and stronger" issues on direct appeal.

He was denied his rights to due process and equal protection under the Fifth and Fourteenth Amendments because the Appellate Division failed to consider his appeal properly.

(Pet. at 4–7).

## III. Discussion

### A. Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court. *Herrera v. Collins,* 506 U.S. 390, 401, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Instead, a state prisoner seeking habeas relief under Section 2254 must show by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petitioner thus has the burden of proving, by a preponderance of the evidence, that his rights have been violated. *See Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir.1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides, in part, that:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was *contrary to,* or involved an *unreasonable application of,* clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in *Jones v. Stinson,* 229 F.3d 112, 119 (2d Cir.2000), the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.'" "Under the 'contrary to' clause, a federal habeas court may grant the writ if

the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409, 120 S.Ct. 1495. This standard does not require that reasonable jurists would all agree that the state court was wrong. *Id.* at 409–10, 120 S.Ct. 1495. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" *Jones v. Stinson*, 229 F.3d. at 119 (quoting *Francis S. v. Stone*, 221 F.3d 100, 109 (2d Cir.2000)).

Section 2254(d)(2) also authorizes the federal courts to grant a habeas writ when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, Section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." *Williams*, 529 U.S. at 389, 120 S.Ct. 1495.

B. *Exhaustion and Procedural Default*

A habeas petitioner is not entitled to have a claim reviewed on the merits if the respondent is able to establish that the claim is subject to an affirmative defense, such as the AEDPA statute of limitations, lack of exhaustion, or procedural default. *See generally Day v. McDonough*, 547 U.S. 198, 205–10, 126 S.Ct. 1675, 164 L.Ed.2d 376 (2006). In this proceeding, the respondent relies on two such defenses, arguing that certain of Roa's claims either have not been fully exhausted or are procedurally defaulted. The first defense, if established, would preclude the Court from granting Roa's petition on the basis of an unexhausted claim, but would not prevent the denial of the claim on the merits. *See Granberry v. Greer*, 481 U.S. 129, 131, 107 S.Ct. 1671, 95 L.Ed.2d 119 (1987) (citing *Strickland v. Washington*, 466 U.S. 668, 684, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). By comparison, a procedural default would absolutely divest the Court of jurisdiction to hear the defaulted claim. *See Coleman v. Thompson*, 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Given the length of time that this case has been pending, I have chosen to address the merits of Roa's unexhausted claims in this Report and Recommendation, as AEDPA expressly allows, unless the claims are procedurally defaulted or must be deemed procedurally defaulted because the state courts would treat them as procedurally barred if Roa were to attempt to return there to exhaust them at this late stage.

In that regard, it is, of course, settled law that a federal court is precluded from reviewing a habeas petitioner's claim if the state court's prior denial of that claim rested on an adequate and independent state ground. *See, e.g., Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 81, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A procedural default qualifies as such an

adequate and independent state ground, *Harris,* 489 U.S. at 262, 109 S.Ct. 1038, unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or ... that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman,* 501 U.S. at 750, 111 S.Ct. 2546; *Glenn v. Bartlett,* 98 F.3d 721, 724 (2d Cir.1996); *accord Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 809 (2d Cir.2000).

■■■■ Additionally, when a state court relies on a state procedural bar, the petitioner is barred from seeking habeas relief even though the state court has ruled in the alternative on the merits of his federal claim. *Glenn,* 98 F.3d at 724 (quoting *Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir.1990)). In determining whether a claim may be heard, courts "apply a presumption against finding a state procedural bar and 'ask not what we think the state court actually might have intended but whether the state court plainly stated its intention.'" *Galarza v. Keane,* 252 F.3d 630, 637 (2d Cir.2001) (quoting *Jones v. Stinson,* 229 F.3d at 118). However, when the last state court to issue a reasoned decision relied on a state procedural bar, federal courts will presume that subsequent decisions rejecting the claim without discussion relied on the bar and did not silently consider the merits. *Ylst v. Nunnemaker,* 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

### 1. *First 440.10 Motion*

In his First 440.10 Motion, Roa argued that his post-arrest statement to Det. Imperato was introduced into evidence at trial in violation of his Sixth Amendment right to counsel. (*See* Ex. E at 1). Justice Berman rejected that claim on the basis that it had to be raised as part of Roa's direct appeal, which was not yet perfected, rather than by means of a CPL § 440.10 motion. (*See* Ex. G at 1).

In his decision rejecting Roa's Sixth Amendment claim, Justice Berman cited CPL § 440.10(2)(b), which provides, in relevant part, that a

> court *must* deny a motion to vacate a judgment when ... [t]he judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal[.]

CPL § 440.10(2)(b) (emphasis added). Despite the plain wording of the statute and Justice Berman's ruling, Roa's Sixth Amendment claim regarding his statement to the police was not subsequently raised in his direct appeal. This claim therefore is procedurally defaulted.

Several other claims arising out of Roa's post-arrest statement are unexhausted and incapable of further state court review at this late date. First, in his omnibus pretrial motion, Roa argued that he "was questioned while in police custody without being adequately informed of his [*Miranda*] rights." (Ex. A at 8). Justice Berman rejected this claim, finding that the police fully informed Roa of his *Miranda* rights and that Roa had a "rather clear understanding of these rights and the effect of waiving them." (Ex. B at 15). Justice Berman further found that Roa's statements "were voluntarily made and were not the result of any promises or coercion." (*Id.*). Following this decision, Roa did not assert a *Miranda* claim as part of his direct appeal or in any of his post-conviction motions; this claim consequently also is unexhausted.

Second, in his amended Petition, Roa seeks to challenge the admissibility of his statement under the Due Process and

Equal Protection Clauses of the Fifth and Fourteenth Amendments. (Pet. at 4–5). These specific claims, however, were not raised in either his direct appeal or any of his post-conviction motions. Therefore, these claims are unexhausted.

Although the state appellate courts have not had an opportunity to address these claims, to require Roa to return to state court now would be a futile exercise. Any attempt to raise these claims at this stage as part of a direct appeal would be rejected because a criminal defendant is entitled to only one direct appeal and one application for leave to appeal to the Court of Appeals. *See* CPL § 450.10(1); N.Y. Rules of Court, Court of Appeals § 500.11(b). Collateral review similarly is unavailable because a defendant, such as Roa, who has prosecuted a direct appeal may not subsequently seek collateral review of an issue that could have been raised on direct appeal but was not. *See* CPL § 440.10(2)(c); *Spence v. Sup't, Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir.2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994).

In these circumstances, because the New York courts would treat these unexhausted claims as procedurally barred, this Court must deem them procedurally defaulted. *Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir.2001) (citing *Coleman*, 501 U.S. at 735 n. 1, 111 S.Ct. 2546). Federal habeas review therefore is precluded unless Roa can demonstrate both cause for his default and actual prejudice, or that the failure to consider his claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Gonza-*

*lez v. Sullivan*, 934 F.2d 419, 422 (2d Cir. 1991). The circumstances giving rise to cause include (a) interference by government officials which makes compliance impracticable, (b) situations in which the factual or legal basis for a claim was not reasonably known by counsel, and .(c) ineffective assistance of counsel. *See Murray*, 477 U.S. at 488, 106 S.Ct. 2639; *Bossett*, 41 F.3d at 829. A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness. *Reyes v. New York*, No. 99 Civ. 3628(SAS), 1999 WL 1059961, *2, 1999 U.S. Dist. LEXIS 17907, at *8 (S.D.N.Y. Nov. 22, 1999). Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." *Aparicio*, 269 F.3d at 90.

In *Aparicio*, the Second Circuit recognized that a "defense counsel's ineffectiveness in failing to properly preserve a claim for review in state court can suffice to establish cause for a procedural default," provided that "counsel's ineptitude rises to the level of a violation of a defendant's Sixth Amendment right to counsel." 269 F.3d at 91 (citing *Edwards v. Carpenter*, 529 U.S. 446, 451, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000), and *Murray*, 477 U.S. at 488–89, 106 S.Ct. 2639). Roa argues that Mr. Schwartz provided him with such severely ineffective assistance by "fail[ing] to properly preserve and argue petitioner's right to counsel issue." (Pet. at 6). However, Mr. Schwartz in fact contended at the suppression hearing that Roa's post-arrest statement was inadmissible because Roa "was represented by an attorney" at the time it was taken. (H.177). There consequently is no basis for Roa's assertion that Mr. Schwartz failed to prosecute (or preserve) this claim.

Roa's default might also conceivably be excused if Mr. Nolan's failure to assert his *Miranda* and Fifth and Fourteenth Amendment claims constituted ineffective assistance of appellate counsel. As set forth below, however, the failure to assert these claims on appeal does not constitute ineffective assistance.

Accordingly, because Roa has not established cause and does not assert that he is actually innocent of the crimes charged, there is no basis for excusing his defaults. This Court therefore lacks jurisdiction to consider his claims regarding his post-arrest statement.

### 2. *Second 440.10 Motion*

In his decision denying Roa's Second 440.10 Motion, Justice Padró rejected on procedural grounds Roa's claims that Mr. Schwartz rendered ineffective assistance of counsel because he should have objected to the prosecutor's "bolstering" of witness testimony and to the court's jury charge regarding eyewitness testimony. Citing CPL § 440.10(2)(c), the Justice concluded that these claims were based "entirely" on facts contained in the record on appeal and that Roa "unjustifiably" had failed to raise them as part of his direct appeal. (Ex. J at 4–5). Accordingly, these claims of ineffectiveness on the part of Roa's trial counsel are procedurally defaulted, unless Mr. Nolan provided ineffective assistance by failing to incorporate them into Roa's appellate brief. As set forth below, that is not the case. This Court consequently also lacks jurisdiction to entertain these claims.

### 3. *Third 440.10 Motion*

Finally, in his decision regarding Roa's Third 440.10 Motion, Justice Padró con-

cluded that there was no factual basis for Roa's claims that Mr. Schwartz was ineffective because he failed to contact Roa's prior counsel, Ms. Russell, and did not allow Roa to testify on his own behalf. Before turning to the merits of those claims, however, the Justice also rejected them on "procedural" grounds, pursuant to CPL § 440.10(3)(c), because there was no justification for Roa's failure to raise them in a prior CPL § 440.10 motion.[6] (Ex. L at 2). In his Petition, Roa once again has advanced no reason why these claims could not have been presented in one of his prior state court motions. Accordingly, in the absence of cause for his default or a claim of actual innocence, this Court cannot consider these ineffective assistance of counsel claims on habeas review.

### C. *Merits of Roa's Remaining Claims*

### 1. *Ineffectiveness of Counsel Claims*

In his Petition, Roa advances several claims relating to the alleged shortcomings of his trial and appellate counsel. In order to prevail on these claims, Roa must demonstrate that his counsel's performance "fell below an objective standard of reasonableness" and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under *Strickland,* there is a "strong presumption that [a lawyer's] conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. 2052. Therefore, a petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might

---

6. CPL § 440.10(3)(c) provides that the state court "may deny a motion to vacate a judgment when ... [u]pon a previous motion made pursuant to this section, the defendant was in a position adequately to raise the ground or issue underlying the present motion but did not do so."

be considered sound trial strategy.'" *Id.* (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). As the Second Circuit has noted, "[t]he *Strickland* standard is rigorous, and the great majority of habeas petitions that allege constitutionally ineffective counsel founder on that standard." *Lindstadt v. Keane,* 239 F.3d 191, 199 (2d Cir.2001).

### a. *Trial Counsel*

#### i. *Pre–Indictment Delay*

■ Roa contends that Mr. Schwartz was ineffective because he failed to request a *Singer* hearing to challenge the prosecution's excessive pre-indictment delay. (*See* Pet. at 6). He first raised this claim in his Second 440.10 Motion. (*See* Ex. H at 6). In that motion and his Petition, Roa theorizes that the prosecution delayed his arrest and indictment for "tactical" reasons, so that the police could "obtain[ ] a statement from [him] in the absence of counsel, which the district attorney used to acquire an indictment and secure a conviction." (*See id.* at 13–14). This argument apparently is based at least partially upon the rule of New York law that the right to counsel attaches once a defendant is indicted, and that any statement elicited from an indictee must be suppressed unless the defendant waived his right to counsel in the presence of an attorney. *See People v. Settles,* 46 N.Y.2d 154, 161–62, 412 N.Y.S.2d 874, 385 N.E.2d 612 (1978).[7]

As Justice Berman concluded, Roa's assertion is sheer speculation. Indeed, at the pretrial suppression hearing, Det. Impera-

to testified about the extensive efforts he made to apprehend Roa prior to his arrest by other officers, which included several surveillances of Roa's neighborhood, the preparation of a "wanted" card, and the circulation of flyers containing Roa's photograph. (H.16–18, 86–87). Det. Imperato also explained that he was unaware that Roa had voluntarily surrendered in connection with another case and was making regular court appearances. (*See id.* at 88 ("Counsel, if I would have known that, your client would have been apprehended a lot sooner.")). Roa has not shown any reason why this testimony should not have been credited by the hearing court.

Additionally, contrary to Roa's suggestion, a request for a *Singer* hearing would not have changed the outcome of his criminal case. In *Singer,* the New York Court of Appeals held that "a lengthy and unjustifiable delay in commencing [a] prosecution may require dismissal even though no actual prejudice to the defendant is shown." 44 N.Y.2d at 253–54, 405 N.Y.S.2d 17, 376 N.E.2d 179. Here, however, less than one year elapsed between Roa's criminal conduct and his eventual arrest and, as Justice Berman noted, Roa is unable to establish any prejudice. (Ex. J at 2–3). Moreover, Det. Imperato plainly did not sit on his haunches in the interim; instead, he sought to locate Roa and took steps which led to his prompt notification once Roa was apprehended by other police officers. Finally, although the inquiry at the suppression hearing may have been briefer than Roa would have liked, he has not shown that there are any addition-

---

**7.** As the Court of Appeals recognized in *Settles,* the protections extended to an indicted criminal defendant under New York law are broader than those afforded a criminal defendant charged in a federal indictment. *See id.* at 161, 412 N.Y.S.2d 874, 385 N.E.2d 612. Under the Sixth Amendment, an indicted criminal defendant may be questioned despite

the absence of any counsel so long as he waives his right to counsel. *See Patterson v. Illinois,* 487 U.S. 285, 292–93, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988); *see also* Fed. R.Crim.P. 44(a) (indicted defendant's right to counsel attaches at the time of initial appearance).

al facts that could have been adduced in support of his claim that he was subjected to unreasonable pre-indictment delay. *See United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (criminal defendant bears the heavy burden of demonstrating that the delay "caused substantial prejudice" to the right to a fair trial and that "the delay was an intentional device to gain tactical advantage over the accused."); *United States v. Perez–Torribio*, 987 F.Supp. 245, 248 (S.D.N.Y.1997) (quoting *United States v. Russell*, 411 U.S. 423, 432, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973)) (indictments are dismissed for Fifth Amendment violations only in "the rarest and most extreme cases of governmental misconduct; namely where the conduct violates that 'fundamental fairness shocking to the universal sense of justice' ").

Mr. Schwartz therefore was not ineffective by virtue of his failure to seek a *Singer* hearing.

### ii. *Failure to Call Ms. Russell as a Hearing Witness*

■ Roa also contends that Mr. Schwartz "failed to contact Ms. Russell, get an affidavit from her verifying that she represented [him] on the *present case* prior to his arrest and/or request that she be called to testify at the [pretrial] hearing." (Reply at 22 (emphasis added)). According to Roa, the testimony of Ms. Russell would have led to the suppression of his post-arrest confession. (*Id.*).

As the respondent correctly observes, Roa bases his allegation that Mr. Schwartz failed to contact Ms. Russell on the fact that she was not called as a hearing witness. (*See* Resp't's Mem. at 39). However, even if his assumption were shown to be correct, it clearly was not unreasonable for Mr. Schwartz to refrain from calling Ms. Russell as a witness because she pre-

viously had advised the hearing court, "under penalty of perjury," that Roa was "at the times of any statements allegedly made to law enforcement officials, represented by counsel in connection with outstanding felony bail jumping charges in New York County Supreme Court." (*Id.* at Ex. A (Affirm. of Susan M. Russell, Esq., dated May 5, 1993) at ¶ 13). Given this explanation of the basis of Roa's suppression motion, Ms. Russell could not credibly have later testified at the hearing that Roa also had retained her prior to his arrest in connection with the murder case.

### iii. *Vouching/Bolstering*

■ In his *coram nobis* petition, Roa asserted that Mr. Schwartz should have objected to improper "bolstering" on the part of the prosecutor. (Ex. M. at 13–14). In his Reply, Roa similarly argues that Mr. Schwartz should have objected when the prosecutor improperly "vouched" for a witness by "making herself an unsworn witness during her opening and closing arguments." (Reply at 17, 37). Although Roa's claim appears to be limited to improper vouching, I will also address his suggestion that the prosecution improperly bolstered its case.

Roa takes issue with two statements that the prosecutor made during the trial. First, during her opening, the prosecutor explained that

Evelyn Rivera identified Rudy Roa as the man who shot her and who killed Juan Munoz and she did that in a police station on October 10th, 1992, about ten months after it happened. That's when Rudy Roa was arrested in this case. And she'll tell you there was no doubt in her mind when she identified him in a line-up at the 34th Precinct on that day.

I expect she'll still remember what he looked like and she'll be able to identify him in court.

(Tr. 21–22). Thereafter, in her closing argument, the prosecutor made several further comments about Rivera's identification of Roa, including the following:

I submit to you that [Rivera] was being honest with you and she told you the truth.

. . . .

I mean, we know that ... Rivera is right when she identified [Roa] in that line-up ten months after. You know she picked out the right person because [Roa] himself confessed to being there on January 7th.

. . . .

For the very same reasons that you know ... Rivera was accurate in her identification of ... Roa in that line-up and for the very same reasons you know she was accurate in identifying him in court, I submit to you that she was also accurate and truthful and honest about exactly what happened on the evening of January 7th.

. . . .

I submit to you if you base your conclusion on ... Rivera's testimony, testimony which was forthright and honest, testimony which was accurate in her identification of [Roa], then you can come to no other conclusion than the fact that it was [Roa] who shot ... Munoz and [Rivera].

(*Id.* at 574, 578–79, 583–84, 594).

A "bolstering" claim typically arises when one witness confirms an identification previously made by another witness. *See Snow v. Reid,* 619 F.Supp. 579, 582 (S.D.N.Y.1985) ("The concept of 'bolstering' ... [is] derived from *People v. Trowbridge,* 305 N.Y. 471, 113 N.E.2d 841 (1953), which holds that it is error to permit an identification made by one witness to be corroborated by the testimony of another witness who merely testifies that the identification did occur."). Here, at trial, Det. Imperato testified about the police lineup procedures and identified a photograph of Roa and the fillers, but never indicated during his testimony that Rivera had successfully identified Roa as the shooter. (*See* Tr. 436–43). Thus, the only person who *testified* that Rivera had identified Roa during the line-up was Rivera (who said she identified the person identified as Number 3). (*Id.* at 103–04). There consequently was no impermissible bolstering of Rivera's identification during the trial testimony or the prosecutor's statements, and no reason for Mr. Schwartz to object.

 Turning to the issue of vouching, prosecutors generally may not "vouch for their witnesses' truthfulness" or "express [their] personal belief[s] or opinion[s] as to the truth or falsity of any testimony or evidence or the guilt of the defendant." *United States v. Modica,* 663 F.2d 1173, 1178–79 (2d Cir.1981) (citation and internal quotation marks omitted). This prohibition arises out of a fear that such vouching may imbue the witness' testimony with "the imprimatur of the [prosecution] and may induce the jury to trust the [prosecution's] judgment rather than its own view of the evidence." *United States v. Newton,* 369 F.3d 659, 681 (2d Cir.2004) (quoting *United States v. Young,* 470 U.S. 1, 18–19, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). Despite the rule against "vouching," "[a]n improper remark by a prosecutor will justify a reversal by this Court 'only if it causes the defendant substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process.'" *United States v. Carr,* 424 F.3d 213, 227 (2d Cir.2005) (quoting *United States v. Shareef,* 190 F.3d 71, 78 (2d Cir.1999)).

The prosecutor's remarks during her opening statement regarding Rivera's

identification of Roa at the police precinct constituted a permissible overview of what the People believed the evidence would be. Indeed, the prosecutor simply explained that she expected the evidence to show that Rivera had identified Roa during the police line-up and would do so again at trial. The prosecutor did not promise or guarantee that Rivera would identify Roa in court or that Rivera would testify that she previously had identified him. The prosecutor consequently did not vouch for Rivera, and there was no reason for Mr. Schwartz to object. Moreover, even if the prosecutor's remarks could be construed as an improper expression of her personal beliefs, Justice Berman specifically cautioned the jury prior to opening statements that "what counsel for either party [said was] not evidence," but simply a "preview of what each side intend[ed] to prove by way of evidence in the case." (Tr. 10). Accordingly, the prosecutor's opening statement did not deprive Roa of a fair trial.

■ Turning to the prosecutor's closing argument, a prosecutor's role in summation is not limited simply to "parroting facts already before the jury" and may include arguments from those facts. *United States v. Wilner*, 523 F.2d 68, 74 (2d Cir.1975). Accordingly, arguments by a prosecutor which are based on the evidence are not improper simply because they begin with a phrase such as "I submit." *See, e.g., United States v. Walker*, 155 F.3d 180, 188 (3d Cir.1998); *United States v. Perez*, 144 F.3d 204, 210 (2d Cir.1998); *United States v. Torres*, 503 F.2d 1120, 1127 (2d Cir.1974). The arguments to which Roa objects made express reference to the evidence and did not express a personal opinion. For this reason,

Mr. Schwartz plainly did not render ineffective assistance by failing to object to these portions of the prosecutor's summation, nor can Roa show that they caused his trial to be fundamentally unfair.

### iv. *Questioning of Detective Imperato*

■ Roa also raises two claims with respect to Mr. Schwartz's cross examination of Det. Imperato. (Reply at 34). In his First 440.10 Motion, Roa argued that Mr. Schwartz should have asked Det. Imperato at trial whether he was aware that Roa was not "on the run" from the police but rather had voluntarily surrendered in response to a bench warrant. (Ex. E at 1). This, he contends, "would have shown the jury that ... [he] was fighting [a] 1990 robbery case that went to trial, which is diametrically inconsistent with avoiding apprehension." (Reply at 36). However, the prosecutor never argued that Roa sought to avoid being arrested or that this evidenced consciousness of his guilt. (*See* Tr. 567–98). The testimony regarding the other case consequently would only have served to inform the jury that Roa had prior involvement with the criminal justice system in connection with another robbery—a fact that no competent attorney would have wanted to adduce at the trial.[8]

Roa's second grievance related to the cross-examination of Det. Imperato is that Mr. Schwartz allegedly failed to conduct a pretrial investigation adequate enough to permit him to show that the lineup at which Rivera identified Roa was tainted. (*See* Ex. H at 7–8). In advancing this argument, Roa notes that Det. Imperato allegedly took a photograph of Roa outside the presence of his counsel, which showed him wearing a burgundy sweatshirt. Roa theorizes that, "if [Rivera] was shot in the

---

8. Testimony about the other case also was irrelevant to the issues at the suppression hearing, which related to the suggestiveness of Rivera's identification of Roa and the voluntariness of his post-arrest statement.

head ... and has problems with her vision, [Det. Imperato] could have shown her that photo, which was probably the reason [Rivera] identified [him] as the perpetrator so quickly." (*Id.* at 6). Based on that assumption, Roa contends that Mr. Schwartz provided ineffective assistance by failing to ask Det. Imperato about the photograph.

What Roa's *post hoc* criticism of Mr. Schwartz's performance overlooks is that Rivera previously had identified Roa when she was shown a photo array containing his image only a few days after the incident. (H.52). She also knew Roa. (Tr. 114–15). There consequently would have been no reason for Det. Imperato to show her a single photograph of Roa many months later in an effort to ensure that she successfully identified Roa during the lineup. In light of these facts, Mr. Schwartz can scarcely be faulted for failing to pursue a line of inquiry which was based on sheer speculation. Moreover, even if Roa's supposition were shown to be correct, and had led to the suppression of the lineup identification, this likely would not have had any effect on the verdict because (a) Rivera had previously identified Roa when she was shown the photo array, (b) Roa admitted that he was in the apartment with Rodriguez because they intended to commit a robbery, and (c) his fingerprints were found on the light fixture concealing the trap.[9]

### v. *Roa's Decision Not to Testify*

 In his Third 440.10 Motion, filed more than nine years after his conviction, Roa argued for the first time that Mr. Schwartz was unprepared to question him because he assumed that he would not testify on his own behalf. He further alleged that Mr. Schwartz coerced him into not testifying despite his desire to do so. (*See* Ex. K at 8–9; *see also* Reply at 24).

When the question of Roa's possible testimony arose at the close of the People's case, the following colloquy took place:

> MR. SCHWARTZ: I have spoken with [Roa], your Honor, he doesn't have any witnesses.
>
> Further, I have indicated to [Roa] that he has the right to take the witness stand....
>
> [Roa] has indicated to me, am I correct, that he does not want to take the witness stand?
>
> [ROA]: Yes.
>
> ....
>
> THE COURT: Now, Mr. Roa, as a defendant in a criminal case you have an absolute right to testify in your own behalf. And should you testify, of course, you would be questioned by Mr. Schwartz, your lawyer. And like any other witness, you would be subject to cross-examination. And in this case, it would be cross-examination by the prosecutor, Miss Gelb.
>
> You also have the right as a defendant to elect not to testify....
>
> Do you understand both of these options?
>
> [ROA]: Yes, I understand.
>
> THE COURT: Having explained both of the options to you, do you feel that you wish to discuss them further with Mr. Schwartz, or are you prepared to give me your answer as to whether you

---

9. Roa's other more generalized claims that Mr. Schwartz did not adequately prepare for trial are also meritless. As Justice Padró noted in his decision denying Roa's Second 440.10 Motion, "the barebone allegations that [Mr. Schwartz's] failure to visit the correc-tional facility and/or recommending that [Roa] take a plea is insufficient to substantiate the claim of deprivation of effective counsel." (Ex. J at 3). Roa has not shown that any additional preparation by Mr. Schwartz would have changed the result of the trial.

wish to testify or whether you choose not to testify?

[ROA]: I wish not to testify.

(Tr. 520–21). Based on this record, Justice Berman rejected Roa's belated assertion that he had wanted to testify, but mistakenly believed that his attorney had the authority to make that decision for him. (Ex. L at 3–4). Roa has failed to show—much less establish through clear and convincing evidence—that this determination, which must be presumed to be correct, was erroneous. Accordingly, he is not entitled to habeas relief on the theory that Mr. Schwartz rendered ineffective assistance by coercing him into remaining silent at trial.[10] Furthermore, if Roa made a voluntary decision not to testify, as Justice Berman found, Mr. Schwartz obviously cannot be faulted for failing to prepare Roa to testify.

b. *Appellate Counsel*

■ Roa's final attack on his lawyers suggests that Mr. Nolan's brief on appeal should have incorporated an argument that Mr. Schwartz was ineffective because he failed to object to the trial court's charge regarding eyewitness identification. (*See* Pet. at 7). Roa first took issue with that charge in his direct appeal, contending that the People's case presented a "close question of identification" and "issues of eyewitness competence," which necessitated furnishing the jury with *"specific guidelines"* concerning the evaluation of Rivera's eyewitness testimony, rather than a boilerplate charge. (*See* Ex. C at 12–14 (emphasis in original)). In its decision affirming the judgment of conviction, the Appellate Division declined to review that claim because it had not been preserved by an objection during the trial, but noted that if it nevertheless were to address the merits, it "would find that the court delivered a full and complete identification charge." *Roa*, 704 N.Y.S.2d at 470.

Following this decision, Roa repackaged his jury charge claim as a claim that Mr. Schwartz had rendered ineffective assistance by failing to object to the trial court's identification evidence charge. (Ex. H at 10–11). Justice Padró rejected that claim as procedurally barred because it was record-based and should have been raised on direct appeal. (Ex. J at 4–5). As noted, it has now morphed once again into a claim that Mr. Nolan was ineffective for failing to raise it as a Sixth Amendment ineffective assistance of trial counsel claim on appeal.

The *Strickland* standard, of course, applies not only to trial counsel, but also to an attorney handling a defendant's appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 395–96, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985); *Aparicio*, 269 F.3d at 95. In preparing a brief, however, appellate counsel is not required to raise every claim arising out of a trial and has the discretion to eliminate weaker ones. *Jones v. Barnes*, 463 U.S. 745, 751–54, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994). Roa therefore must show that his appellate counsel did something more than omit a nonfrivolous argument that Roa wished to pursue. *See Barnes*, 463 U.S. at 753–54, 103 S.Ct. 3308; *Aparicio*, 269 F.3d at 95. He must

---

10. Roa's Sixth Amendment claim relating to his failure to testify on his own behalf also is arguably procedurally barred because Justice Berman held that it should have been raised in a prior CPL § 440.10 motion. (*See* Ex. L at 2). I nevertheless have discussed the merits of this claim because Roa's Petition also seeks to characterize Mr. Schwartz's alleged deficiencies as a violation of his rights under the Fifth and Fourteenth Amendments. These additional claims, although unexhausted, obviously would fail for the same reasons as his Sixth Amendment claim.

establish that counsel opted not to raise "significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo*, 13 F.3d at 533; *Bragg v. Kuhlmann*, No. 97 Civ. 3025(SHS), 1998 WL 867245, **3–4, 1998 U.S. Dist. LEXIS 19430, at *9–*10 (S.D.N.Y. Dec. 14, 1998) (citing *Benn v. Stinson*, 917 F.Supp. 202, 206 (S.D.N.Y. 1995)).

Here, at the conclusion of the trial, Justice Berman gave the jury detailed instructions concerning Rivera's identification testimony, cautioning them, as follows:

> [C]onsider whether or not [Roa] is one of the actual perpetrators of the crimes and whether ... Rivera ... had sufficient time to observe him on the day and time in question.

> Consider the physical factors existing at the time, such as lighting conditions and the description of [Roa]. In the latter regard you should examine with care the witness's opportunities during the commission of the crime to observe and remember facial features, body size and other physical characteristics.

> You must ask yourself, did the witness have an adequate opportunity to observe and, therefore, to remember the perpetrator?

> Take into consideration the reliability and accuracy of the testimony of the witness, her powers of observation. And consider all of the witness's testimony with respect to the opportunity she had to form in her mind a clear and convincing picture of the person who it is claimed committed the crime.

> The possibility of human error or mistake, possible likeness or similarity of objects or persons are elements that you

must act upon in considering testimony as to identity.

> You must carefully consider these factors passing upon the credibility that you attach to the witness's testimony. And you must be satisfied beyond a reasonable doubt as to the accuracy of the witness's identification of [Roa].

> Now, under the laws of the State of New York, the testimony of a single witness on identification is sufficient to prove identity provided that the witness persuades you beyond a reasonable doubt on the issue of identity.

> You must consider the credibility of an identification witness the same way as any other witness. *Consider* whether [Rivera] is truthful, is accurate, is free from prejudice, and the *capacity of the witness for perception, observation, reflection, memory and reasoning* as revealed upon the witness stand . . . .

(Tr. 618–20 (emphasis added)).

These instructions conformed to the recommended practice in the New York courts in one-witness identification cases, which is to give a detailed identification charge, directing the jury to consider in its deliberations the witness' means and opportunity for identification. *See* 1 Howard G. Leventhal, *Charges to the Jury and Requests to Charge in a Criminal Case in New York*, CTJNY § 4:48 (West 2007). The instructions also incorporated much of the expanded pattern jury instruction described by the Second Department as "truly commendable" in *People v. Daniels*, 88 A.D.2d 392, 453 N.Y.S.2d 699, 704–05 (2d Dep't 1982). There consequently was no basis for Mr. Schwartz to object to the charge, nor did it constitute ineffective assistance for Mr. Nolan to omit a claim based upon the lack of such an objection from his brief on appeal.[11]

---

11. Although I have addressed the sufficiency of Justice Berman's eyewitness identification

charge in connection with Roa's ineffective assistance of counsel claim, the respondent is

### 2. *Appellate Division Consideration of Roa's Appeal*

■ Roa's final ground for relief is that he was denied his Fifth and Fourteenth Amendment due process and equal protection rights because the Appellate Division allegedly "failed to properly address [Roa's] facts, which were never disproved, order a hearing and adhere to the decisions of the [New York Court of Appeals] and the decisions of the federal courts which are binding on the Appellate Division." (Pet. at 7). Roa first attempted to assert this claim in his papers seeking leave to appeal the Appellate Division's denial of his petition for a writ of error *coram nobis.* (*See* Pet. Attach. ("Additional Submissions" at 1–4)). Specifically, Roa complained that the Appellate Division had cited no law in its decision and failed to conduct an evidentiary hearing. (*See id.*).

Neither of these alleged shortcomings entitles Roa to habeas relief. Although the Appellate Division rejected Roa's petition for a writ of *coram nobis* summarily, this was its right. *See Jimenez v. Walker,* 458 F.3d 130, 141 (2d Cir.2006); *Sellan v. Kuhlman,* 261 F.3d 303, 314 (2d Cir.2001). Indeed, the United States Court of Appeals frequently disposes of cases in the same manner. *See* 2d Cir. R. 0.23(a).

Additionally, the sole issue presented by Roa's *coram nobis* petition was the effectiveness of Mr. Nolan, his appellate counsel. The Appellate Division does not, of course, conduct its own evidentiary hearings, but it has "the flexibility ... to refer *factual disputes* for hearings to the nisi prius court or perhaps to judicial hearing officers." *People v. Bachert,* 69 N.Y.2d 593, 600, 516 N.Y.S.2d 623, 509 N.E.2d 318 (1987) (emphasis added). Here, however, the factual record was plainly sufficient for the Appellate Division to determine the merits of Roa's ineffective assistance of appellate counsel claims without a hearing. Moreover, the alleged deficiencies that Roa contends should have been raised as part of his appeal have each been shown to be meritless. There consequently is no basis for Roa's claim that the Appellate Division violated his due process or equal protection rights.

### IV. *Conclusion*

For the foregoing reasons, Roa's habeas petition should be denied. Moreover, because Roa has not made the substantial showing of the denial of a constitutional right, required by 28 U.S.C. § 2253(c) (2), a certificate of appealability should not be issued.

---

correct that this claim is procedurally barred because Justice Padró found, pursuant to CPL § 440(2)(c), that it should have been raised in Roa's direct appeal. (*See* Ex. J at 4–5). Nonetheless, Roa also has asserted the related (but clearly unexhausted) claim that the identification charge violated his Fifth and Fourteenth Amendment rights. In that context, the appropriate question to ask is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." *Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977) (internal quotation marks and citation omitted). A petitioner is not entitled to

relief unless "there is a reasonable likelihood" that the jury misapplied the court's instructions in way that deprived him of due process. *Jones v. United States,* 527 U.S. 373, 390, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).

In this case, there is no question that Roa was in the apartment at the time of the shooting and participated in a robbery during which he carried a gun. Indeed, he admitted as much. The only question before the jury was whether he fired the shots, as Rivera testified, or Rodriguez did, as Roa claimed in his post-arrest statement. It is clear that the instructions that Justice Berman gave the jury were more than adequate to enable them to decide this narrow issue, and that Roa consequently was not deprived of due process.

## V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within ten days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable P. Kevin Castel, United States District Judge, United States Courthouse, 500 Pearl Street, New York, New York 10007, to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. *See* U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Castel. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).